**STRINGER et al. v. JOHNSON.** (No. 568.)

(Court of Civil Appeals of Texas. Beaumont. May 12, 1920. Rehearing Denied May 19, 1920.)

1. **Adverse possession** ⬤⇒101—**Actual possession insufficient to give title to contiguous tract subsequently purchased.**

Where a person who has acquired title by adverse possession to a certain portion of a league purchases a tract contiguous thereto, the continued actual possession of the land to which he had acquired adverse possession without enlargement or extension so as to reach the land purchased would not give him title by adverse possession to land purchased; his possession of other tract not being extended thereto by construction.

2. **Adverse possession** ⬤⇒115(4) — **Inclosure by fence and use for pasture for required period held for jury.**

In trespass to try title, whether plaintiff's predecessor, who plaintiff claimed to have ac-

quired title by limitation under 5 and 10 year statutes, had kept the land continuously inclosed by a fence for any period of 5 or 10 years, and during such period continued its use and enjoyment as a pasture for stock, *held* for the jury.

**3. Adverse possession ⬡⟹112 — Limitation claimant must prove every fact necessary to give title.**

One asserting title to land by limitation has the burden of proving every fact necessary to give such title; inferences never being indulged in favor of a limitation claimant.

**4. Adverse possession ⬡⟹14—Mere fencing of · land without actual occupancy not sufficient.**

The mere fencing of land, though land is claimed under a deed duly of record, and taxes are duly paid thereon, will not, of itself, without the statutory contemplated use, cultivation, or enjoyment, give such purchaser title by limitation under either the 5 or 10 year statutes.

**5. Adverse possession ⬡⟹115(2) — Possession at times by tenants for cutting timber held not to give landlord title by adverse possession as matter of law.**

That a grantee had several Mexican tenants who at times camped upon the 30-acre tract in tents for purpose of cutting timber for wood and charcoal, etc., and at times cultivated a small garden on the land, *held* not as a matter of law to give grantee title by adverse possession as against true owner.

Error from District Court, Jefferson County; E. A. McDowell, Judge.

Action by Mrs. Annie H. Johnson against T. A. Stringer and another. Judgment for plaintiff, and defendants bring error. Reversed and remanded.

E. M. Chester and E. E. Easterling, both of Beaumont, for plaintiffs in error.

John Hancock, of Thurber, and Smith & Crawford, of Beaumont, for defendant in error.

HIGHTOWER, C. J. This was an action of trespass to try title, brought by Mrs. Annie H. Johnson, as plaintiff, against T. A. Stringer and B. M. Chester, as defendants, to recover about 60 acres of land, a part of the Absolam Williams league in Jefferson county, the land being sued for as one tract, and so described in the plaintiff's petition by specific metes and bounds. Plaintiff also specially pleaded title to the land under the statutes of limitation of 3, 5, and 10 years. Defendants disclaimed as to all the land sued for by plaintiff, save and except a tract consisting of about 30 acres, which was described by metes and bounds in their answer, and as to this 30-acre tract they pleaded the general denial, not guilty, and also interposed the 3, 5, and 10 year statutes of limitation.

The case proceeded to trial with a jury, but at the conclusion of the evidence the trial court, at plaintiff's request, peremptorily instructed a verdict in her favor for all the land sued for by her, and upon the verdict thus obtained, judgment in her favor was rendered. Defendants, at the proper time, objected and excepted to the trial judge's action in instructing the verdict against them for so much of the land as was described in their answer and claimed by them, and after their motion for new trial was overruled defendants prosecuted a writ of error to this court.

For convenience, plaintiffs in error will be referred to as "appellants," and defendant in error as "appellee."

At the trial below, appellee never attempted to show title in herself from the sovereignty or from any other source, but relied soley upon her claim of adverse possession as to all the land sued for, while appellants established title in themselves from the sovereignty; and, therefore, appellee was not entitled to an instructed verdict in her favor as to the 30-acre tract described in appellants' answer, unless it can be said that the evidence as a whole showed, without contradiction or dispute and was therefore conclusive, that appellee had acquired title thereto by limitation, as claimed by her. This alone was the issue between the parties below, and we shall try to state, as succinctly as possible, the substance of the material evidence relative to such issue, as the same is reflected by the record.

In August, 1878, Joseph Nassis and wife, who were not shown to have any title, executed and delivered to one Ezekial Janes a deed purporting to convey to Janes a tract of approximately 33 acres of land, a part of the Absolam Williams league. The deed specifically described the 33 acres by metes and bounds, and was duly recorded soon after its execution. Janes at once took actual possession of this 33-acre tract, claiming it under his deed duly of record, made permanent and substantial improvements thereon and lived thereon, claiming the land as his own, and paid all taxes as they accrued, and continued in peaceable and adverse possession of this 33-acre tract until 1910. By such continuous adverse possession, Janes acquired title to said 33-acre tract, and this is admitted by appellants. In 1892, one C. U. Connellee, who was not shown to have any character of title, but who, it seems, was asserting some character of claim antagonistic to Janes, made a deed to Janes, purporting to convey to Janes said 33-acre tract, title to which at that time Janes had already acquired by limitation under both the 5 and 10 year statutes, and such deed also purported to convey to Janes the 30-acre tract which is claimed by appellants in this suit, and of which they were the true record owners, the two tracts,

however, being conveyed as one described by specific notes and bounds. This deed from Connellee to Janes was duly recorded within a few weeks after its execution, and the proof showed, without dispute, that Janes thereafter regularly paid all taxes due on the 30 acres in controversy until 1910. The undisputed proof shows that up to the time Janes got said deed from Connellee, his improvements of every kind and character had been confined to the 33-acre tract, which lies immediately south of the 30-acre tract in controversy, and Janes, up to that time, never had any character of possession of any portion of the 30-acre tract owned by appellants, or rather their predecessors in title. As to whether Janes ever had such actual possession of the 30-acre tract here in controversy, or any portion thereof, subsequent to the deed from Connellee and for such length of time as would confer title by the 5 or 10 year statute of limitation (there could be none under the 3-year statute, because there was no connection with the sovereignty) was, we think, an issue of fact for the determination of the jury.

Counsel for appellee, in their argument in this court, conceded that her right to recover the 30-acre tract in controversy must depend upon proof that title to that tract was acquired by Janes by limitation subsequent to the execution of the deed to him from Connellee in 1892. If the evidence upon that point showed, conclusively, that is to say, without dispute or contradiction, that Janes had so acquired title to the 30-acre tract, then the instructed verdict was proper; but, if not, the issue should have gone to the jury.

Appellants have attacked the action of the trial court, in peremptorily instructing the verdict against them, by several assignments of error, but the gist of their contentions may be stated as follows:

(1) That Janes' possession of the 33-acre tract under the deed from Nassis and wife having continued for such period of time as to give him perfect title by limitation, the 33-acre tract was thereby effectively segregated from all remaining portions of the league, and just as much so as if the true owner had conveyed the 33-acre tract to Janes; and that when Janes took the deed from Connellee in 1892, which, according to the boundaries specified, conveyed both the 33-acre tract and the 30-acre tract here in controversy, Janes' actual possession of the 33-acre tract was not thereby extended by construction to the 30-acre tract, and that Janes' actual possession of the 33-acre tract remaining the same after the deed from Connellee as before, and being in no manner enlarged or extended to the larger tract described in the Connellee deed, such continued actual possession of the 33-acre tract, however long continued, without enlargement or extension so as to reach the 30 acres here in controversy, was insufficient to require the true owner of the 30-acre tract to go to the records to ascertain the extent of Janes' claim.

(2) That as to whether Janes ever had and held such continuous, actual possession of the 30-acre tract in controversy, and so used, cultivated, or enjoyed the same for a period of time sufficient to give him title by limitation under either the 5 or 10 year statute, after taking the deed from Connellee, was under the evidence adduced, an issue of fact for the jury.

We do not find in appellee's brief any counter proposition which absolutely and unequivocally denies the soundness of the first contention made by appellants, as shown above, but by the second counter proposition, which comes nearer to doing so than any of them, appellee replies that the undisputed evidence showed that Janes, subsequent to taking the deed from Connellee, and while still in actual possession of the 33-acre tract, as before, also took actual possession of the 30-acre tract, and used, cultivated, and enjoyed it for some period of time, and that, even if less than the statutory term, still such possssssion, however brief, was sufficient to require the true owner of the 30-acre tract to go to the record to ascertain the extent of Janes' claim to that tract, and that such possession, regardless of its duration, put the statutes of limitation in motion as to the 30-acre tract, which continued so long as Janes occupied and used either of said tracts.

As to the second contention made by appellants, as we have shown it above, appellee replies that the evidence adduced upon the trial showed, conclusively and without conflict or contradiction, that Janes had and held adverse and peaceable possession of the 30-acre tract for a period of time sufficient to perfect title in him under both the 5 and 10 year statutes.

[1] After careful consideration of the proposition involved, we have reached the conclusion that appellants' first contention, as above shown, is sound, and must be sustained. We do not think, however, that either of the cases cited by appellants in support of their contention can be said to be exactly decisive of the point in their favor, for we think that none of such cases is precisely relevant in its facts to the instant case. The cases cited by appellants in support of their contention are Broom v. Pearson, 98 Tex. 469, 85 S. W. 790, 86 S. W. 733; Hill v. Harris, 26 Tex. Civ. App. 408, 64 S. W. 820; Holland v. Nance, 102 Tex. 177, 114 S. W. 346; Bird v. McHargue, 182 Ky. 27, 205 S. W. 957, the last mentioned being a Kentucky case. But though the cited cases are not squarely relevant in their facts, yet the reasoning by which the conclusion

was reached in them all, and especially that of Hill v. Harris, supra, applies, strongly 'we think, in favor of appellants' contention here. Hill v. Harris was a decision by the Galveston Court of Civil Appeals, speaking through Justice Gill, and the Supreme Court of this state denied a writ of error. There was but one point in the case for the consideration of the Supreme Court, and that court's action denying the writ of error meant, of course, that in the opinion of the Supreme Court the judgment of the Court of Civil Appeals was correct, but it would not necessarily follow, of course, that the Supreme Court approved in toto the reasoning of the Court of Civil Appeals in reaching its conclusion. But, however that may be, it occurs to us that the reasons given for the conclusion by the Court of Civil Appeals in that case are sound and logical, and that the reasoning there applies to the point here under consideration. It was substantially held in Hill v. Harris that, where a person held a part of a league of land under a deed duly recorded until title thereto was perfected in him by limitation, his possession could not be extended, by construction, so that limitation would run in his favor as to any other portion of the same league by his taking a deed to the remainder of the same league, of which he did not take actual possession also, notwithstanding it was shown that taxes upon the whole league were regularly and duly paid after the second deed was taken. In reaching the conclusion there, the court, among other things, said:

"It seems to us, therefore, that it is not so much a question of extent of claim on the part of those asserting limitation as it is a question of the sufficiency of the possession to send the true owner to the record to ascertain the extent of the claim. The taking and recording of a deed to land will not of itself put the statute in motion in favor of a claimant thereunder. Neither will adverse possession put the 5-year statute in motion, in the absence of a duly recorded deed and the payment of taxes. The true owner may ignore such a deed until his domain is actually invaded. The record of it is not notice of the adverse claim as to the true owner until some act is done upon the land itself amounting to adverse possession. When this occurs, the owner must take notice of it, and the record of the deed immediately becomes constructive notice of the extent of the adverse holder's claim. That the record of a junior deed is not constructive notice to prior purchasers is now well settled. * * * We mention this only to emphasize the fact that the record of the deed under which defendants claim the 1,000 acres was utterly without significance as to plaintiffs, if unaccompanied by adverse possession. It has been shown that the adverse possession of the 3,234-acre tract had ripened into perfect title in those holding it prior to the purchase by the senior Kennedy, so that, conceding that the legal title to the entire league had been in the plaintiffs, the senior Kennedy, by his purchase of the last-

named tract, acquired a title thereto as unassailable as if plaintiffs themselves had conveyed it. It was thereby as effectually segregated from the remainder of the league as if it had been conveyed to him by the true owner. At the time of Kennedy's purchase of the 1,000-acre tract, his possession of the larger tract had served its purpose and had ceased to be unlawful. * * *"

So in this case title to the 33-acre tract was complete in Janes by limitation long before he took the deed from Connellee in 1892 and therefore the 33-acre tract was, at the date of the last-mentioned deed, effectively segregated, in legal contemplation, from all other portions of the Absolam Williams league; and since the undisputed evidence showed that Janes, after taking the deed from Connellee, did not enlarge his improvements upon the 33-acre tract so as to extend them in any way to the 30 acres here in controversy, and the character of his possession of the 33-acre tract being in no manner changed, his continued actual and unchanged possession of that tract did not have the effect to extend, by construction, his possession to the 30-acre tract now in controversy, the true ownership of which is admitted to be in appellants. And we cannot agree with counsel for appellee in their broad contention that any act or conduct on the part of Janes that constituted actual possession for any period of time, however brief, after recording the deed from Connellee, was sufficient to put the statutes of limitation in motion in his favor, and that limitation then continued as long as Janes held actual possession of the 33-acre tract. On the contrary, we cannot escape the conclusion that in order for Janes to have acquired title by limitation to the 30-acre tract in controversy, notwithstanding the fact that he placed the Connellee deed promptly of record and paid all taxes accruing thereon, it was incumbent upon appellee to show, by conclusive evidence, in order to entitle her to an instructed verdict in this case, that Janes took and held actual possession of the 30-acre tract, claiming the same adversely, and held such possession continuously for a term sufficient to give him title under either the statute of 5 or 10 years; and we shall not proceed to discuss that point.

Appellee, in this connection, first contends that the undisputed proof conclusively showed that Janes, shortly after taking the deed from Connellee in 1892, inclosed the 30-acre tract in controversy with a wire fence, and that he kept it continuously inclosed until 1910, when he sold the land to appellee's predecessor in title, and that during all that period of time, Janes was using this inclosure for a pasture for stock, both cattle and horses, and that such inclosure, use, and enjoyment of the land constituted, in contemplation of law, adverse possession in him

as against the true owner, and that, it being undisputed that the Connellee deed describing the 30-acre tract was duly of record during such period of possession, and that all taxes were regularly paid, title by limitation was shown to have been complete in Janes, under both the 5 and 10 year statutes, long before appellee acquired the title through him. Of course, if appellee is correct in this contention as to what the undisputed evidence was, we would not be required to go any further, but would sustain the contention and affirm the judgment. After a careful consideration of all the testimony found in the record, we think that it cannot be held that it was shown by the undisputed evidence, in its entirety, that Janes kept this 30 acres continuously inclosed by a fence for any full period of either 10 or 5 years between the time he took the Connellee deed and 1910, when his possession ended; neither can it be said that the evidence, as a whole, showed conclusively and without dispute that the land was used continuously as a pasture during any such period of time while Janes had it. It may be conceded, and we might add it is the opinion of this court, that the evidence on the part of appellee, if there were no other, was sufficient to warrant the court in instructing the verdict in this case, and therefore it will be unnecessary to discuss the evidence of any witness for the appellee, nor will it be necessary to discuss the evidence in detail of the several witnesses who testified for appellants; but, in disposing of the point now under consideration, it will be sufficient to note or mention such portions of the evidence introduced by appellants, as defendants below, as was of such character, we think, to require the submission to the jury of the issue whether Janes' possession and use of the 30-acre tract as a pasture was such as to give him title by limitation. As stated above, it was conclusively shown upon the trial that appellants have the record title to the 30 acres in controversy, lying just north of and contiguous to the original 33-acre tract purchased by Janes from Nassis and wife, and that appellants hold such title under a regular and consecutive chain of transfers from the sovereignty, and that they also claim title under a deed from the heirs of one Emma Fennels, whatever that claim of title may amount to. Among other witnesses introduced by appellants, as defendants below, on the issue of limitation, was the witness George Simmons, whose testimony in full was as follows:

"I am 58 years old and have been living in Beaumont all my life. I live in the north end of town about a quarter of a mile north of the place where Zeke Janes use to live. I have known Zeke all my life. I have lived up there north of Zeke's old place 30 years. He had about 30 or 40 acres of land fenced in out there, and he had it fenced when I moved out there. It was north from him and south from me. He had it fenced with a pew fence, made out of pews. That is the kind of fence he had around his field. He had a wire fence north of his field right close to where we live, and about 30 acres of land was fenced inside that fence. That fence was put up about 6 years after I went out there. It was black land, and nothing inside that fence but woods, pine, oak, and gum, some large and some small. There were no houses inside of that pasture. That fence stayed there 3 or 4 years; it had some gaps in it, so that we could go through this land. There were no gaps left here, and the fence was down so you could pass through it, and I have seen it down in different places, during the 3 years it was up there. There was no horses or nothing of that kind in there; nothing but woods. After that 3 years Zeke quit keeping the fence up, and it was torn down by people going through there. The first time I ever saw any horses in Zeke's pasture was about a year after that wire fence was put up; Dan Gill put them in there. That pasture was not on the 30-acre tract; it was between the 30-acre tract and Zeke's homestead. It was a little round place, about two or three lots, something like that, that he would bring horses up and put them in there. It was south of where Emma Fennels lived. It was not inside of Zeke's field. Dan kept his horses in there about six or eight months. He didn't keep them in there all the time either. He would keep them in there three or four days at a time. That little pasture fence where Dan kept his horses was built after the wire fence was built, and before the wire fence was torn down. There wasn't any horses or cows in the 30-acre tract, except some time when people would go through and leave the gate open stock would get in there. I never saw Dan Gill's horses in the 30-acre tract. I saw his horses, about seven or eight head in that little pasture. The fence around that 30-acre piece was a three-wire fence. It was fastened to trees and posts. The fence was sufficient to keep stock in and out, except when the gaps were down. When the gaps were down stock would get in there. I have seen that fence down at other places than the gaps, but cannot say how often. I never saw any stock in there except when the fence was down. I went through there very often. In going to my work, sometimes I would go through there and sometimes I would go to Magnolia. I cannot say whether I went through there as often as once a week or as often as once a month but I would go just which way I wanted to. I lived about two blocks from the north fence of that 30-acre tract. The Connellee tract had about 30 acres in it, and was right next to us, and was between us and Zeke Janes' field. The fence I spoke of is on the Connellee tract. There was no cross fence that I know of between the Connellee tract and the Zeke Janes 30-acre tract. The fence stayed around the Connellee tract about 3 years. It went down when Zeke quit fooling with it. All the fence I have been telling about was on the Connellee tract, except the little fence where Dan Gill put his horses. That was not on the Connellee tract. No, sir; Zeke Janes never had any pasture out there. None at all. There was no fence south of the Connellee fence, ex-

cept the fence around Zeke's field. That is the only fence that I saw. I don't know exactly how far Zeke's field was from the Connellee fence, but it was about three-quarters of a mile. I know where Zeke's house was; it was on the Nancy White tract. I lived north of the Connellee 30-acre tract. I never saw any fence around the land between the Connellee 30-acre tract and the tract where Zeke had his field."

### Cross-examination:

"The pasture that I am testifying about came up in about two blocks of where I live, and is on the Connellee land. Yes; I know where the Connellee land is. There is 30 acres of it. That was the pasture that I had been going through and about which I testified about being down in about 2 or 3 years after it was built. Zeke Janes built that fence. No; we had nothing against Zeke Janes. I did not cut his fence down. He put gaps in there so that we could open and close them. Zeke had no pasture between the Connellee tract and Zeke's field. There was no pasture in there. I never did see any horses in there. Emma Fennels lived kinder to the side of her father's field, but it wasn't between Zeke's field and the Connellee tract. She lived about two blocks from his field fence. When we came through the Connellee pasture we would come right up on the south and come out there (pointing to north line of Connellee's fence). The Connellee pasture, the pasture that I have been testifying about, is about three-quarters of a mile from Zeke's house, I guess. The closest person living around the place where we would go out of the Connellee pasture was Emma Fennels. The pasture fence that I have been testifying about did not take in Zeke's field. If there was any other pasture there I know nothing about it. Yes; I know Dan Gill. I know Mr. Johnson, the merchant that lives on Concord road. I don't know exactly how far I live from him. He has delivered groceries to my place. He has bought produce from me. He has been living there a good while. He lives about a mile from that pasture.

"Q. And you say that Zeke didn't have any fence around the north part of his field? A. No, sir."

### Redirect examination:

"Amos Prater did not live in that pasture. He lived west of Zeke's field, and kinder west of Emma Fennels. Amos Prater had a house and a patch fence around it. Amos' girl tore the house down and moved it before Emma Fennels died. I saw Zeke Janes cutting wood on the tract of land where Emma Fennels lived, but he is about the only one I ever saw cutting wood in there. Some Mexicans lived there on the Amos Prater place, but I don't remember ever seeing them cutting any wood. I don't know exactly how long they lived there. I never saw anybody living in a tent on that tract of land or camping on it. That tract of land had been pretty well cut over before Zeke sold it. Emma Fennels lived there 7 years. I remember when the house was built there. Her papa helped to build it; I don't remember who else. From the place where I would come out of the Connellee pasture it was about three or

four blocks before I would come to Emma Fennels' house. I think all that land between the south fence on the Connellee tract and Emma Fennels was open land. I never saw any fence around it."

Appellants also, as defendants below, introduced the witness Frank Thomas, whose testimony in full was as follows:

"I am 49 years old, and live on the Concord road about a quarter of a mile from where Zeke Janes used to live. I have known Zeke Janes all my life, and know where his house was out there. I don't know how many acres he had in the field around his house. He had a pasture around his house, but I don't know how many acres, neither do I know how long he kept the pasture up. I don't exactly remember when he had the pasture there. I know he had a pasture, and him and Dan Gill and Sid Milligan use to pasture some horses up there, and it was up as often as it was down. I remember when Zeke sold out and moved. I don't know how long it was before that, that I saw this fence around that pasture; I didn't pay any attention to it. That Milligan boy was running around with Dan, and they pastured some horses in that pasture, but I couldn't tell you exactly how often. I don't know how many years they did that; I didn't keep any account of that. They didn't keep the stock in that pasture all the time. Whenever they wanted to go in the cove and catch wild horses they would put them in that pasture. Sometimes the pasture was down, sometimes it was up. I couldn't tell you how long it would stay down; they were always fixing up fence around there. Sometimes I went through there hunting and saw it down. I was up in that neighborhood all the time. Sometimes in the evening I went out there hunting. I used to hunt in that pasture. Sometimes there would be one or two cows in there. They were supposed to be Zeke Janes' cows. He didn't keep his cows in there all the time. Everybody would turn their stock out, and when they wanted to go in that pasture they would go on through. There wasn't any stock law out there at that time. I knew Emma Fennels, but don't remember what year she died. At the time she died Archie (her husband) had quit her. The fence was down then. I don't know how long it was down. All the posts were down where stock ran over it and knocked it down, and they would go there and repair it. It was torn down that way around about in different places. It was a two or three wire fence; I don't remember. When that fence was down other peoples horses and cattle went in there, because I had a little mare named Nellie, and she got away one day, and I found her in that pasture; the fence was down. That was a good many years ago. It was after Emma Fennels and Archie broke up, but before Emma died. I don't know exactly how long before she died. I suppose Emma and Archie lived together about 6 or 7 years. I remember Dan Gill used to have horses out there in that pasture, but whether or not they were his I don't know. That was after Emma Fennels' death, I believe. At that time they would go and repair that fence whenever they wanted to put anything in there; they would build it up again. They would put stock in there a month or two,

and then the fence would get down, and if they wanted to put some more stock in there they would have to repair it. I don't know how long that would be between times. I didn't keep no account, and I didn't keep the days, years, months, or weeks of that at all. Sometimes it was down weeks and months as far as I know exactly. Whenever I would go through there sometimes it would be down and sometimes it would be up."

Cross-examination:

"I have been living in and around Beaumont all my life. I have been married 23 years, and have one child, and have been living on Concord road about two miles north of Beaumont all those 23 years. Zeke Janes was living on the Gold Hill addition, north of town, when I married. I remember when he sold his place. He had a daughter named Emma Fennels. She died right there in Zeke's house before he moved away. She lived in the house that Archie built on Zeke's property in the pasture. Zeke was supposed to give her some land. She lived up in the pasture. I don't exactly remember how long she lived in there. She and Archie broke up while they were living in there. There was a pasture up north of Zeke's pasture. It was supposed to belong to Zeke. The pasture that I was testifying about being down was the one that Dan and Milligan used to put horses in. I have no interest in this case. I am just letting my testimony come out just like I haven't got any interest whatever in this case. I haven't talked about this case at all. Yes, sir; I talked to Mr. Chester about what my testimony would be in this case. There was one big pasture, and there was a fence that cut across there. I don't know the difference in the size of those pastures; I only saw them sometimes when I went through there hunting. I don't know which pasture was the largest, because I never paid much attention to them, but I did pay attention to the fence, because I was through there hunting. That has been a long while ago. I couldn't tell you how long it has been since that fence was built. I cannot tell you which fence fell down first. Sometimes the fence was down in panels. In other words there was no fence there at all. I don't know whether it would turn stock or not, but I do know that they had to repair it occasionally. I am a carpenter. I have handled horses and cattle. I have seen stock in that pasture. The fence was sufficient to hold cattle for a while, but if they wanted to get out they could get out. There never was a bunch in there. They could break out. I didn't pay any attention to which fence was down, whether it was the north or south pasture. I know that the fence was down sometimes, and that is all I know about it. I couldn't tell you whether or not all that fence was down when Zeke left, because some fellows went there and put a new wire fence around there. I think George Simmons put a new wire fence around there. A new wire fence was put there a year ago. I drove a wagon through there, and saw where the new fence was put up. It was around the land where Zeke had the pasture, and around the Amos Prater place. There was a pasture there when Zeke used to live there, but I cannot say that it was a pasture that would hold stock

222 S.W.—18

if they wanted to get out. I don't remember now whether or not Archie Fennels was around his wife when I found my little mare Nellie in that pasture. I think they had broken up. Nellie was a gray mare, and I bought her from Gilbert Scott and paid $75 for her."

Redirect examination:

"I used to play around Amos Prater's place before Amos and Adeline died. I used to be over there all the time. They lived on that side (indicating west) of the pasture. His house was right off here, and the pasture was in here, running up toward the Simmons settlement. There was a fence running along by Prater's house up to Ike Black's house. I couldn't tell you how that fence was; it ran in such a zigzag way; that fence ran all kinds of ways. Just to come to the facts about it, there wasn't much of a fence at all."

Cross-examination:

"I have built some fences; a good many. That fence that we have been talking about is just like some children had been playing. If a horse wanted to get out he could do so; that is the way that fence was. I think a fellow would be foolish to try to keep a horse in there. I know I wouldn't put a horse in there if I expected him to stay in there. He could go right on about his business."

[2] We think that it must be conceded, after the testimony of these two witnesses is considered as a whole, that the issue of whether Janes kept the 30 acres in controversy continuously inclosed by a fence for any period of 5 or 10 years, and during such period continued its use and enjoyment as a pasture for stock, was a question of fact for the determination of the jury. It must be borne in mind that the question is not whether the evidence was sufficient to have warranted a finding in favor of appellee on the issue of limitation, but the question is, Was the state of the evidence such that the trial court could take the issue away from the jury, and determine the credibility of all the witnesses and the weight to be given to all the testimony? According to the evidence of the witnesses Simmons and Thomas, the jury could have found that the fence which Janes had around the 30-acre tract in controversy was down for "weeks and months at a time," and that stock passed in and out at will, not only stock belonging to Janes, but other stock in the community belonging to other owners, and while the evidence of these witnesses also shows that the fence was frequently repaired, and especially at times when it would be needed to hold stock that was being gathered, it nevertheless leaves the matter in such shape that a jury would be warranted in concluding that the fence was not kept up around the land for any continuous period of 5 or 10 years, and we think that the burden was upon appellee, in order to warrant an instructed verdict in the case, to show that the fence was kept up for

at least some continuous period of five years during the time Janes was claiming the land under the deed from Connellee, and that if there were breaks in the fence they were repaired within a reasonable time, and also that the land so inclosed for such period of time was used continuously as a pasture, or used or enjoyed in some other way contemplated by the statute.

[3, 4] One asserting title to land by limitation has the burden of proving every fact necessary to give such title, and inferences are never indulged in favor of a limitation claimant. Dunn v. Taylor, 102 Tex. 80, 113 S. W. 265. But even if it had been shown conclusively by all the witnesses that Janes kept the land inclosed by a fence for a continuous period of 5 or 10 years, without any breaks whatever, still such mere inclosure, unaccompanied by such use, cultivation, or enjoyment as the statute contemplates, would not have been sufficient to give Janes title by limitation. In other words, the mere fencing of land, although claimed under a deed duly of record and taxes duly paid thereon, will not, of itself, without the statutory contemplated use, cultivation, or enjoyment, give such possessor title by limitation under either the 5 or 10 years' statute. Niday v. Cochran, 42 Tex. Civ. App. 292, 93 S. W. 1027; Buster v. Warren, 35 Tex. Civ. App. 644, 80 S. W. 1063. As we construe the evidence as a whole, it not only fails to show, conclusively and without dispute or contradiction, that Janes kept the 30-acre tract inclosed by Janes during any consecutive 5 or 10 years while he claimed the land, but it also fails to show, conclusively, that he used the land as a pasture for stock for any period of 5 or 10 years consecutively. It is true the evidence shows that he very frequently gathered and pastured stock upon this land, but it also shows, or at least a jury would be warranted in concluding, that there were periods of time of perhaps months that no stock was kept on the land as a pasture, but, on the contrary, stock belonging to people in general in the community would come in at will and go out at will, and it cannot be said, therefore, that the proof was conclusive, as a whole, that Janes kept this tract of land inclosed and used it as a pasture for any consecutive period of 5 or 10 years.

[5] But appellee further contends that the trial court correctly instructed the verdict in her favor, for the reason that the evidence was such as to show, without reasonable dispute, that Janes after taking the deed from Connellee, at times had Mexican tenants upon the 30-acre tract, who were engaged in cutting timber from the tract for wood and charcoal, etc., and that these Mexican tenants were upon the land some 6 or 7 years; that these Mexican tenants lived in tents while they were engaged in cutting the timber, and that they also cultivated portions of the land. It is true, as shown by the undisputed evidence, that Janes had several Mexican tenants who camped upon the 30-acre tract in tents at times, and that they were engaged in cutting the timber into wood and burning coal, etc., and that the cutting of this timber was quite extensive, but we do not think that it could be said, as a matter of law, that the cutting of the timber through these Mexicans was such use or enjoyment of the land, of itself, as would constitute adverse possession and divest title out of the record owner, but that such use of the land, together with all other uses made by Janes, would be matters for the determination of the jury; that is to say, the jury should be permitted to determine whether such acts upon and use of the land constituted adverse possession, under proper instructions from the court. As to the cultivation which appellee claims these Mexicans did upon the land, it was quite meager indeed—nothing more than a garden, a small potato patch at times—and we are of opinion that it cannot be held, as a matter of law, that such character of alleged cultivation was sufficient to divest title out of the true owner under either of the statutes of limitation.

We cannot tell, of course, since the record does not disclose, upon what theory the trial judge peremptorily instructed the verdict in this case, but it is stated in appellants' brief that the trial judge did so upon the theory that when Janes took the deed from Connellee in 1892, which embraced or included the 30-acre tract in controversy, and continued to remain in undisputed actual possession of the 33-acre tract already owned by him, such possession extended immediately, by construction, to the 30-acre tract in controversy, and, having continued until 1910, title to Janes under both statutes of limitation was complete in him, without regard to the character of possession had by Janes of the 30-acre tract, or the use made by him of that tract. If such was the trial court's theory, we think, as we have said above, that he was in error, and also think that the question as to whether Janes ever had such actual possession of the 30-acre tract, and so used, cultivated, or enjoyed it for any consecutive period of 5 or 10 years as would give him title by limitation was an issue of fact for the jury, and that the trial court, therefore, erred in peremptorily taking that issue from them. Appellants' assignments of error based upon that action of the court are sustained, and the judgment will be reversed, and the cause remanded; and it is so ordered.