## HARDCASTLE v. FITZGERALD et al.

### No. 1964.

Court of Civil Appeals of Texas. Beaumont.
April 8, 1930.

Jno. D. McCall and C. A. Lord, both of Beaumont, for appellant.

Crook, Lefler, Cunningham & Murphy, of Beaumont, for appellees.

O'QUINN, J.

We shall refer to appellant as plaintiff and appellees as defendants, that being their attitude in the trial court.

Plaintiff sued defendants in trespass to try title to a 20-acre tract of land described by metes and bounds in his petition. The suit was originally brought against J. K. Fitzgerald as defendant, and J. K. Fitzgerald, Jr., intervened claiming that he was the owner of the land in controversy, alleging that he held same under a conveyance from the trustee in bankruptcy, executed by said trustee in the voluntary bankruptcy proceeding filed by the original defendant J. K. Fitzgerald. Plaintiff then filed an amended petition complaining of both J. K. Fitzgerald and J. K. Fitzgerald, Jr., said petition being in the usual form of trespass to try title. Both defendants, J. K. Fitzgerald and J. K. Fitzgerald, Jr., answered, and J. K. Fitzgerald, Jr., pleaded the general denial, not guilty, and the three, five, and ten year statutes of limitation.

The case was tried to the court without a jury. Plaintiff showed a regular chain of title from the Mexican government down to himself. Defendants relied upon their defense of limitation. The court found in favor of the defendants under their claim of ten years' limitation, and rendered judgment in favor of defendant J. K. Fitzgerald, Jr., for the land. At request of plaintiff the court filed his findings of fact and conclusion of law. There is also in the record a full statement of facts agreed to by the parties and approved by the court.

Appellant's first four propositions, from various angles, attack the finding of the court in favor of defendants under their plea of ten years limitation, and his awarding judgment in accordance with said finding, because, it is insisted, there is no evidence to support the finding of adverse possession for ten years, and the judgment, therefore, is without support in the evidence and against the law.

The following facts appear without dispute: Plaintiff was the record owner of the land. He showed payment of taxes on the land without delinquency from and including the year 1907 to the trial of the case. Plaintiff's father, under whom he held the title to the land, rented the land in question to E. M. Wright about the year 1913 for a period of three years at a rental of $3 per acre. Wright owned a tract of 301 acres bounding the tract in controversy on three sides, north, east, and west. The south line of the 20 acres in question was in a straight line with the south line of the Wright 301-acre tract. The following sketch shows the relative situation of the two tracts:

Wright fenced his land and the south line of fence passed along the south line of the 20

acres and included it within the Wright inclosure. Wright rented the 20 acres from Hardcastle in 1913 and used same. J. K. Fitzgerald rented the 301 acres from Wright in 1916 and lived there and cultivated it under his tenancy. He also had the 301 acres rented in 1917. About December 28, 1917, Fitzgerald bought the 301 acres from Wright. Relative to the 20 acres in controversy he testified:

"Mr. Wright told me to go ahead and fence this 20 acres and use it. * * * He did not tell me that he had it leased before. He told me that I could fence it up and use it, and acting upon that I fenced it up. Then I thought I owned it right then, because I knew that you take this land where the title wasn't good to it and fence it, in ten years the law gives it to you, and thats what it did, and there has been no objection to it since, none in the world. As to whether I just without any right or without any title commenced claiming that land, well, I didn't say anything about claiming it, but thats what I did. He said fence it and use it, and it was there, inclosed in his field. It was inclosed within his tract of land. So when I went there I found a fence around the place; not on this piece of land; that is, I found a fence around his place in such a manner that it inclosed this tract of land. The fence bordered on one side of this tract; that is, the fence touched one side of this tract of land, up and down the big road. This little 20 acres were fenced up within his; there was one fence around the place. I believe it was 301½ acres in his inclosure. * * *

"I rented this 301 acres from Mr. Wright in 1916. * * * I don't know whether Mr. Wright had been cultivating the 301 acres which I rented from him in 1916. The land evidently had been used in rice, but I don't know when or anything about that part of it. It is the fact that Mr. Wright had been pasturing the land when it was not in rice—that is, his land; they had pastured all the land some, because it was in a pasture when I moved there, all in one fence, all around it.

"In 1916 I fenced this 20 acres off to itself. I did that because I used it for a pasture; I wanted a pasture, and he said fence it up and take it over and use it, and thats what I did. I fenced it up with his permission, and knew it was not my land."

He further testified:

"I fenced it up with the intention of keeping the land, for the simple reason they told me the title wasn't no good. If the title had been good I would have bought the land when I bought the other; but I knew the title wasn't good. * *. * If the title had been good, I probably would have bought it from Schwaner; I wouldn't say I would or would not; but I would have bought it, I guess, at that time, if the title had been good. I don't know about whether it was my intention if the title was ever shown to be good, to buy it from Schwaner or whoever owned it. * * * I had the land and was using it, and I knew when I owned it there for a number of years—I wouldn't have bought it, no, with the title in the shape it was.

"I don't remember about that part of it, whether I have ever told anybody but my lawyer that I claimed this land. I don't remember telling anybody else, but I had the land fenced and was claiming it from the beginning. * * * I had Wright's land adjoining this rented in 1916 and lived on it as his tenant. In 1917 I continued to use the land and live there as his tenant. I don't know whether I would have fenced the land if Mr. Wright had not told me to or not. I had to have pasture room, and probably would have; I don't doubt that I wouldn't. I would have fenced the land up; sure, I would, if I knew the land was right in the tract of land and right there at me. He did tell me to fence it."

He further testified:

"It is not a fact that I made Mr. Henry Schwaner an offer on this land in 1918 or 1919, that is, an offer to buy it. I didn't make him any offer to buy it at any time for the simple fact when he first saw me about the land I told him the title to the land wasn't any good; it wasn't a perfect title. * * * There wasn't much said about buying the land at all. I didn't tell Mr. Schwaner that if he could fix the title up to the land I would buy it. * * * He said something to me about buying the land and I told him no I wouldn't buy it just at this time; it was about 1916. He did not say that it would be alright for me to keep on using the land. I don't remember the conversation but I told him I had it fenced up and was using it. * * *

"What I said was that Schwaner talked to me about the land soon after I fenced it in 1916. Now I don't know what Schwaner might have wrote or what he had to say about it afterwards, but he talked to me when I moved there about buying the land, something about it, and after I got the land from Mr. Wright, and Mr. Wright told me to fence this piece of land; along about that time Mr. Schwaner asked me about buying the land. * * * I don't remember to have ever asked him about it afterward because I told him at that time I had the land fenced and was using it.

"I formerly knew H. C. Schwaner. It is my understanding that Mr. Schwaner is dead. * * * Mr. Schwaner said something to me about buying the land just about at the time when I went there—that is, afterwards about —I don't know how long. Mr. Schwaner came to me, instead of me going to him. I told Mr. Schwaner that I had the land fenced and was using it. He never made any objections whatever. As to whether I aimed to convey that information to him as the agent

for the owner, I don't know anything about —he said something—it was sort of the understanding that he was the agent for the owner, but you understand I didn't know; he said something about buying the land, and I said 'Mr. Schwaner, I got the land fenced and am using it,' and he raised no objection. I didn't tell him particularly that I was claiming it.

"I told him that I had the land fenced and was using the land and expected to continue to use it. He made no objection and never did make any objection about it at all, never did come out to see me or anything about it at all. I don't know about whether I went to Henry Schwaner in 1919 and told him that I would like to buy the land or not; that has been a good while ago * * * I won't say that it is not a fact because I don't know, I don't remember. Nobody else had any land adjoining this 20 acres besides me."

He further testified:

"In 1916 I fenced this 20 acres off to itself. * * * I fenced it up with his (Wright's) permission and knew it was not my land. * * * I claimed it from 1916 right on up to this good day * * * although I have never paid taxes on it nor ever rendered it for taxation. I have told somebody that I did own it. Judge Crook has been knowing it for a few years. I told my lawyer since I got sued for it. * * *

"As to whether I ever aimed to buy the land, well I don't know whether I would have bought it if the title was good, right at the beginning in 1916. I didn't aim to mislead Mr. Schwaner or anybody else. * * * If the title had been good I would have bought the land when I bought the other; but I knew the title wasn't good. * * * If the title had been good, I probably would have bought it from Schwaner; I wouldn't say I would or not; but I would have bought it, I guess, at that time, if the title had been good. I don't know whether it was my intention, if the title was ever shown to be good, to buy it from Schwaner or whoever owned it; I don't know whether I would or not; I had the land and was using it, and I knew when I owned it there for a number of years—I wouldn't have bought it, no, with the title in the shape it was, I didn't drop the notion of buying the land at all; wouldn't have bought it at all with the title in the shape it was when I first talked about it to Schwaner. * * * I don't remember about that part, whether I have ever told anybody but my lawyer that I claimed this land. I don't remember telling anybody else, but I had the land fenced and was claiming it from the beginning."

▆▆▆▆ We have set out Fitzgerald's testimony rather fully because, as we construe it,

it shows that his possession was not hostile. Wright was a tenant of Hardcastle, the true owner of the land. Fitzgerald entered upon the land with the consent of Wright. His possession was therefore permissive. He thus became the tenant of Hardcastle. In order for his possession to become adverse, it must appear that he repudiated his tenancy in such way as that it gave notice of such repudiation to the owner of the land. There is nothing in the record to evidence such repudiation. It is true that Fitzgerald says he at once began to claim the land after he fenced and took possession of same, but there is nothing to show that to be true other than his mental conclusion to do so. He says that he never told any person that he was claiming the land other than his attorneys representing him in this suit. Dietzman v. Sayles (Tex. Civ. App.) 245 S. W. 773; Railway Co. v. Robinson, 79 Tex. 608, 15 S. W. 584; Werts' Heirs v. Vick (Tex. Civ. App.) 203 S. W. 63; Wilson v. Beck (Tex. Civ. App.) 286 S. W. 315; Kelly v. Blakeney (Tex. Civ. App.) 172 S. W. 770, 771; Stringer v. Johnson (Tex. Civ. App.) 222 S. W. 267; Meurin v. Kopplin (Tex. Civ. App.) 100 S. W. 984; 2 Texas Jurisprudence, § 69. Furthermore, he says that when Schwaner, the agent of the owner of the land, was talking to him trying to sell him the 20 acres, he did not tell Schwaner that he was claiming the land, but merely told him that he had fenced and was using the land, and that Schwaner did not object. Why should he object? Wright was the tenant of the owner; Wright gave Fitzgerald permission to take and use the land. He says that he took possession because Wright told him to. Schwaner had no knowledge of any intention of Fitzgerald to repudiate the tenancy. Fitzgerald made no effort to inform Schwaner or anybody else of any such intent. It does not appear that he ever told Wright of his intention to claim the land. He says that when he took possession of and began to use the land that he knew it was not his, and that Wright did not sell it to him, but that Wright gave him permission to take and use it. Further, when Schwaner was urging him to buy the land, he told Schwaner that he "wouldn't buy it just at that time." We think Fitzgerald's testimony, considered as a whole, shows that he all the time recognized Hardcastle's title in and to the land, and that he never had that open, notorious, adverse, and hostile possession that is necessary to mature title by limitation.

What we have said renders consideration of appellant's other assignments unnecessary. It follows that the judgment should be reversed and here rendered for appellant, and it is so ordered.

Reversed and rendered.